**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| Jeffrey Kaloustian, individually, and on behalf of others similarly situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　　　　vs.<br><br>FORD MOTOR COMPANY,<br><br>　　　　　　　　　Defendant. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Jeffrey Kaloustian, individually and on behalf of the below-defined nationwide and statewide classes he seeks to represent (collectively, the "Class") by the undersigned counsel, allege, against Defendant, Ford Motor Company ("Ford" or "Defendant"), the following based upon Plaintiff's knowledge, where applicable, and upon counsel's investigation information and belief:

## INTRODUCTION

1.     This class action lawsuit is brought by Plaintiff individually and on behalf of all current and former owners and lessees of Ford vehicles model years 2017-2019, that were marketed and sold with overstated fuel economy (the "Class Vehicles"). Class Vehicles include but are not limited to 2018 Ford F-150 and 2019 Ford Ranger trucks.[1]

2.     Automakers are responsible for testing their vehicles for fuel economy and emissions ratings using methods that conform to EPA rules and regulations.  Fuel economy is measured under controlled conditions in a laboratory using tests specified by federal law.  Car manufacturers are responsible for testing their own vehicles and then reporting the results to the

---

[1] Plaintiff reserves the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

EPA.[2]  These fuel economy testing procedures must be performed in order to receive official Environmental Protection Agency ("EPA") fuel economy ratings.  The EPA allows vehicle manufacturers to determine their own methods for calculating fuel economy, so long as those methods conform to EPA rules.[3]  Because the process is one of "self-certification," car manufacturers can make the most favorable assumptions (or errors) in their calculations.[4]  By doing so, a car manufacturer can report that its vehicles are more fuel efficient than they actually are.  Due to errors in Ford's analytical models, its fuel economy testing procedures were not accurate and, as a result of those inaccuracies, the Class Vehicles' fuel economy have been overstated.

3.      On February 21, 2019, Ford announced that it was launching an investigation into the accuracy of the analytical modeling it uses to determine the fuel efficiency and emissions ratings for its vehicles.  Ford has admitted that its newest model of truck, the 2019 Ranger, is just the first model that is being investigated for improper laboratory testing, but other models are likely impacted by the improper practices.  The specific problem relates to Ford's estimation of "road-load," which simulates aerodynamic drag, friction, and tire-related losses when testing on a dynamometer.  Road-load is an important metric that is used during laboratory testing to represent the forces a vehicle will encounter during real-world driving conditions.  In order to accurately calculate fuel economy ratings during laboratory testing, these road-load calculations must be accurate.

4.      Every Class Vehicle has a window sticker containing EPA-required indications of fuel economy, including city and highway mileage, miles per gallon, and a combined city and

---

2 https://www.fueleconomy.gov/feg/how_tested.shtml (last accessed Oct. 6, 2019).
3 https://www.consumerreports.org/fuel-economy-efficiency/ford-emissions-under-criminal-investigation/
4 https://www.consumerreports.org/fuel-economy-efficiency/ford-emissions-under-criminal-investigation/ (last accessed October 5, 2019).

highway miles per gallon figure.  These fuel economy ratings are one of the most important factors in new-car buyer's purchase decisions because they allow consumers to compare vehicles of various manufacturers for purchase or lease.  Ford knows the importance consumers place on fuel economy ratings, and it used inaccurate drag and resistance calculations in order to boost Class Vehicles' EPA mileage ratings, thereby making the Class Vehicles more appealing to customers.  Ford's misstatements regarding the fuel economy of the Class Vehicles are material because Ford knows the weight consumers place on fuel economy when making a new car purchase.

5.     Defendant represented the accuracy of its EPA fuel economy ratings on each of its Class Vehicles' federally mandated windows stickers and in its various advertising statements regarding such vehicles.  In reality, these EPA fuel economy ratings materially overstated the Class Vehicles' actual mileage per gallon ("MPG") and fuel economy which Defendant represented was based on the required accurate testing pursuant to federal mandate.  Fuel economy of an automobile relates the distance traveled by a vehicle to the amount of fuel consumed over that distance.  It is typically expressed in terms of gallons of gasoline consumed to distance traveled in miles.   MPG is calculated by dividing the number of miles traveled by the amount of gasoline consumed to travel such miles (miles driven ÷ gallons used = mpg).

6.     Plaintiff purchased a car with stated EPA fuel economy ratings and advertised fuel efficiency ratings that were inaccurate, thereby making his Class Vehicle appear more efficient and economical in terms of gas mileage than it actually was.

7.     If Ford had followed the proper testing procedures and used accurate mathematical modeling during laboratory testing, the EPA fuel economy ratings represented to consumers would have been materially different – the actual miles-per-gallon would have been

lower than the false fuel economy ratings that Defendant represented as accurate on each Class Vehicles' window sticker and in advertising. Ford has now admitted that its testing methods were incorrect and, as a result, produced artificially high fuel economy ratings. The misstatements made by Ford regarding Class Vehicles' fuel economy ratings are material because the EPA numbers provide a necessary tool for vehicle comparison which consumers rely on when evaluating vehicles to lease or purchase.

8.      The EPA testing methods are required by federal law, but Ford's testing methods were flawed and insufficient as shown in greater detail below. Ford deliberately misrepresented or miscalculated certain road testing factors during internal vehicle testing processes in order to report that its vehicles were more fuel efficient than they actually were. Thus, Ford's methods produced inaccurate fuel economy ratings that did not comply with federal regulations.

9.      Ford knows that consumers are concerned with vehicles' fuel economy and rising fuel prices, and markets its inflated fuel economy claims to entice consumers to buy or lease Ford vehicles instead of those of its competitors. With respect to its 2019 Ford Ranger, Ford promised that its midsize truck "will deliver with durability, capability and fuel efficiency, while also providing in-city maneuverability and the freedom desired by many midsize pickup truck buyers to go off the grid."[5]  Ford also reported that its "All-New Ford Ranger [was] Rated Most Fuel Efficient Gas-Powered Midsize Pickup in America."[6]  Ford further described the Ranger as "the no-compromise choice for power, technology, capability and efficiency whether

---

[5] Exhibit 3, Statement from Todd Eckert, Ford Truck Group's Marketing Manager, https://thenewswheel.com/2019-ford-ranger-most-fuel-efficient/.
[6] https://media.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html.

the path is on road or off."[7]  Thus, Ford knew that in order to sell the Ranger, it had to emphasize the fuel efficiency of the truck, and that this information was material to consumers considering a new vehicle purchase.

10.     However, in contrast to Ford's promises, as noted above, the Class Vehicles (i) are not as fuel efficient as Ford promised; (ii) are not what a reasonable consumer would expect; and (iii) are not what Ford had advertised. Further, the Class Vehicles' promised fuel economy and efficiency is obtained only by altering the testing calculations.

11.     Representations made by Ford about the Class Vehicles' fuel efficiency were deceptive and false, and Ford further omitted information that would be material to a reasonable consumer, namely that Ford used inaccurate mathematical figures during internal vehicle testing processes, in order to report that its vehicles were more fuel efficient than they actually were.

12.     Ford knew or should have known facts indicating the inaccuracies in the advertised MPG of the Class Vehicles, but consciously or recklessly disregarded facts that indicated that Ford's fuel economy ratings were misstated and overstated.  Despite Ford's own employees questioning its testing practices and the calculations that Ford was utilizing for fuel economy ratings, at least by September 2018,[8] Ford took no action to correct the problems, nor to alert consumers that their test methods were flawed and that consumers would not get the promised fuel economy.

13.     Ford's failure to correct its false advertised MPG estimates, and concomitant failure to disclose the defects in its fuel economy testing, constitutes actionable misrepresentations, unfair, unlawful, fraudulent, and deceptive business practices in violation of

---

[7] *Id.*
[8] https://www.nytimes.com/2019/02/21/business/ford-emissions.html (last accessed Oct. 5, 2019).

the consumer protection laws of Michigan, and a breach of Ford's express and implied warranties.

14.     Plaintiff brings this action individually and on behalf of all other current and former owners or lessees of the Class Vehicles. This action seeks relief for the injuries sustained as the result of the inaccurate testing methods used by Ford to ascertain the fuel economy ratings of their vehicles and the resulting material misstatements of fuel economy used in the marketing and sales of the Class Vehicles.

15.     Plaintiff and the Classes have been damaged by Ford's misrepresentations, concealment, and non-disclosure of the MPG metrics, and, as a result, were misled into leasing or purchasing Class Vehicles which were of a different quality than they were promised, and thus paying higher fuel costs they would not otherwise have paid.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because at least one Class member is of diverse citizenship from the Defendant; there are more than one hundred (100) Class members; the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000; and this action is a class action in which members of the Class (as defined below) are citizens of states different from Defendant. Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted by Plaintiff under 15 U.S.C. § 2301, *et seq.*

17.     This Court has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367.

18.     This Court has personal jurisdiction over Plaintiff who is a United States citizen and submits to the Court's jurisdiction. This Court has personal jurisdiction over Ford

because Ford purposely availed itself of the laws of this state by conducting a substantial amount of its business in the state, including designing, testing, manufacturing, and/or distributing Ford vehicles, including the Class Vehicles, in this state and District. Ford also developed, prepared, and disseminated warranty materials for the Class Vehicles within and from its headquarters in this District.

19.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a) and (c) because a substantial part of the events and/or omissions giving rise to Plaintiff's claims occurred in this District. Ford's headquarters and principal place of business are in this District. Ford has marketed, warranted, sold, and leased the Class Vehicles, and otherwise conducted extensive business within this District. The design, development, and testing of Class Vehicles took place in significant part within this District, including at Ford's headquarters in Dearborn, MI.

## THE PARTIES

20.     Plaintiff and putative class and subclass members have purchased or leased a Class Vehicle with inflated fuel economy claims.

21.     Plaintiff Jeffrey Kaloustian ("Kaloustian") is currently a citizen of the State of Michigan residing in Whitmore Lake, County of Livingston. Plaintiff Kaloustian leased a 2018 Ford F-150 on May 18, 2018 at the Varsity Ford dealership in Ann Arbor, Michigan.  The 2018 Ford F-150 window sticker specifically stated that the Class Vehicle's fuel economy MPG was: 19 city; 24 highway and 21 combined city/hwy. Plaintiff Kaloustian has never received fuel economy even close to these advertised numbers in his Ford Class Vehicle.  Plaintiff Kaloustian has experienced real world fuel economy below the ratings claimed by the Defendant.  Had Plaintiff Kaloustian known the truth about his vehicle's fuel economy, he would not have made the choice to lease the vehicle.

22.     Defendant Ford is a Delaware corporation, with its principal place of business and national headquarters located at One American Road in Dearborn, Michigan.  The Ford Class Vehicles are advertised, distributed and sold at multiple places of business throughout the United States through a network of Ford dealers, among other places.  Defendant engages in continuous and substantial business in all states in the United States, including Michigan.

23.     Whenever reference is made to any act by Defendant or its subsidiaries, affiliates, and other related entities, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of Defendant committed, knew of, performed, authorized, ratified and/or directed that act or transaction for Defendant while engaged in the scope of their duties.

## FACTUAL ALLEGATIONS

### A.     Coastdown testing and dynamometer testing is used to determine EPA fuel economy ratings

24.     Fuel economy is measured under controlled conditions in a laboratory using a series of tests specified by federal law. Manufacturers test their own vehicles—usually pre-production prototypes—and report the results to the EPA.  The EPA then reviews the results and confirms about 15%–20% of them through their own tests at the National Vehicles and Fuel Emissions Laboratory.[9]  Largely, manufacturers test their own vehicles and thus, all results sent to the EPA are on the "honor system" because the EPA will only test a small fraction of all vehicles produced.

25.     Ford deliberately miscalculated and misrepresented factors in the mathematical formulas used in its vehicle certification testing in order to report that the Class Vehicles had

---

[9] https://www.fueleconomy.gov/feg/how_tested.shtml (last accessed October 5, 2019).

better fuel efficiency and emissions ratings than they actually did.  The false factors relate to the "Coastdown" testing "Road-load" calculations used during the testing process.

26.     Coastdown testing is performed to determine the metrics that will later be used to calculate a vehicle's fuel economy values.  These fuel economy values are known as the vehicle's "MPG rating."  Coastdown testing is used to measure the different types of resistance that vehicles encounter on the road during real-world operation, including: vehicle aerodynamic resistance (a factor that relates to the amount of energy the vehicle uses to push air out of the way as it moves); tire rolling resistance (a factor that determines the amount of energy the vehicle has to use to handle the resistance between the tires and the road); and driveline and powertrain mechanical resistance (a factor that measures the amount of energy the vehicle uses to overcome internal friction to drive the wheels).

27.     A coastdown test is performed on an actual roadway, and data from that test – including aerodynamic drag, tire rolling resistance, and drivetrain frictional losses – is then used in the laboratory when the vehicle is tested on a dynamometer.  In the coastdown test, the vehicle is brought to a high speed on a flat, straight road and then set coasting in neutral until it slows to a low speed.  The tester records the time the vehicle takes to slow down, which is then used to calculate the forces to be applied on the dynamometer.  Coastdown testing is governed by procedures outlined by the Society of Automotive Engineers (SAE).  The EPA recommends following the procedures set forth in the SAE standard procedure J2263 (revised December 2008) and J1263 (revised March 2010) to measure road-load for dynamometer simulation.[10]

28.     Testing to determine a vehicle's MPG rating is performed on a dynamometer, which is essentially a giant treadmill that allows a car to simulate driving by placing its wheels on rollers.  Once on the dynamometer, a driver runs through various standardized driving

---

[10] https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1 (last accessed October 29, 2019).

routines or cycles that simulate typical trips in the city or on the highway.[11]  During this process, the level of resistance on the dynamometer is adjusted based on the coastdown testing results for each specific vehicle model.  To ensure that the dynamometer is accurately reflecting real-world driving conditions, testers calculate a metric during coastdown testing known as "road-load," and this metric simulates aerodynamic drag, friction, and tire-related losses.  The EPA defines "road-load" as the force that is imparted on a vehicle while driving at a constant speed over a smooth, level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag.[12]

29.     When a vehicle is tested on a dynamometer, the EPA requires manufacturers to supply road-load calculations to simulate the load from aerodynamic drag, friction, and tire losses associated with road operation.  These representative road-load forces must be supplied for vehicles at speeds between 9.3 mph and 71.5 mph for emissions and fuel economy testing.[13] The EPA has established test procedures for this process which have been widely used and accepted; but the EPA also allows the use of analytical modeling when the manufacturer uses good engineering judgment.[14]  A manufacturer may use whatever method it chooses to calculate road-load but whatever method chosen must result in accurate road-load force specification and dynamometer settings.[15]  The correct measure of these forces is critical to the simulation of actual real-world driving when a vehicle is tested in the laboratory.  Ford's testing did not correctly account for these forces, leading to better (and completely inaccurate) fuel economy estimates.

---

[11] https://www.fueleconomy.gov/feg/how_tested.shtml (last accessed October 5, 2019).
[12] https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1 (last accessed October 29, 2019).
[13] Id.
[14] Id.
[15] Id.

30.     In order to ensure accuracy, the test is performed at least 5 times on a completely flat, straight, and dry road in both directions of the track.  Performing the test multiple times is meant to eliminate the effect of wind speed and direction. The test results from the five driving cycles are combined to yield individual "city" and "highway" values and a combined city/highway fuel economy value which assumes 55% city and 45% highway driving.[16]  These figures are then sent from the vehicle manufacturer to the EPA and ultimately displayed on the vehicle's window sticker and represented to consumers in various advertising media.

**B.     The results of dynamometer testing are displayed on vehicles' window stickers and in advertising.**

31.     Every new vehicle is required to have a window sticker, formally known as a "Monroney sticker" after the lawmaker responsible for the 1958 Automobile Information Disclosure Act that makes the window sticker mandatory.  Since the 1970s, these window stickers have been required to contain fuel economy labels (MPG estimates), as required by the Energy Policy and Conservation Act.[17]  The EPA is responsible for providing the fuel economy data that appears on the window sticker.  The EPA/DOT Fuel Economy and Environment window sticker contains MPG estimates that are based on standardized laboratory test procedures to ensure that the MPG estimates are "reliable, repeatable, and fair across different car models."[18]  This allows the consumer to accurately compare the fuel efficiency among various vehicles.  Periodically, the EPA updates its methodology to determine fuel economy in

---

[16] https://nepis.epa.gov/Exe/ZyPDF.cgi/P100IENB.PDF?Dockey=P100IENB.PDF (last accessed October 6, 2019).
[17] https://www.epa.gov/fueleconomy/history-fuel-economy-labeling (last accessed October 6, 2019).
[18] https://nepis.epa.gov/Exe/ZyPDF.cgi/P100IENB.PDF?Dockey=P100IENB.PDF (last accessed September 13, 2019).

an effort to reflect the modernization of vehicles and improved vehicle testing.[19] For example, in 2017 the EPA updated some of the calculations which manufacturers can use to determine EPA fuel economy to better reflect newer more fuel-efficient vehicles.[20]

32.    Manufacturers are responsible for testing their own vehicles with the EPA's standardized laboratory test procedures and are then required to report the results to the EPA.[21] Manufacturers are not required to test every vehicle but only "one representative vehicle— typically a preproduction prototype—for each combination of loaded vehicle weight class, transmission class, and basic engine."[22]

33.    In fact, the EPA only reviews and confirms the results of about 15-20% of the vehicles with its own testing,[23] leaving the majority of vehicle fuel economy testing and reporting to the honor system of the manufacturers.

34.    An EPA guidance letter to car manufacturers, dated February 23, 2015, the purpose of which was to clarify the procedures used in establishing road-load force and dynamometer settings, stated that:

> The method a manufacturer elects to use to characterize the road-load force is optional; however, the manufacturer is responsible for the accuracy of the road-load force specification and dynamometer settings. It is also the manufacturer's responsibility to ensure that the vehicles it produces conform to the road-load specification reported in the application for certification and used for certification and fuel economy testing.[24]

### C.    Ford consistently promotes the fuel economy of the Class Vehicles

---

[19] https://www.epa.gov/fueleconomy/history-fuel-economy-labeling (last accessed September 13, 2019).

[20] https://www.epa.gov/fueleconomy/basic-information-fuel-economy-labeling (last accessed September 13, 2019).

[21] https://www.fueleconomy.gov/feg/how_tested.shtml (last accessed September 13, 2019).

[22] https://www.fueleconomy.gov/feg/which_tested.shtml (last accessed September 13, 2019).

[23] https://www.fueleconomy.gov/feg/how_tested.shtml (last accessed September 13, 2019).

[24] https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1 (last accessed September 13, 2019).

35.     Ford has consistently promoted the fuel economy of its vehicles in order to entice customers to purchase these vehicles.  With respect to the 2019 Ford Ranger, Ford boasted of the vehicle's fuel efficiency with a stated EPA-estimated fuel economy rating of 21 mpg in the city, 26 on the highway and 23 combined for its two-wheel drive truck.[25]  Ford's four-wheel drive Rangers rated 20 mpg city, 24 highway and 22 mpg combined.[26]  "This is best-in-class EPA-estimated city fuel economy rating of any gasoline-powered four-wheel-drive midsize pickup," Ford stated.[27]  Ford also promoted its vehicles' fuel economy on its website.  In fact, on Ford.com, Ford touts the fuel economy of the 2019 Ranger stating it's the "BEST-IN-CLASS EPA-ESTIMATED GAS MPG."[28]  On Ford.com today, Ford also advertises that the 2019 Ford Ranger is "THE MOST FUEL EFFICIENT GAS-POWERED MIDSIZE PICKUP IN AMERICA."[29]

36.     These fuel economy ratings also appeared on the window sticker of the vehicles where consumers use them to compare material vehicle qualities to help make informed choices about the cars they purchase or lease.

37.     There is no question that Ford is aware of the importance of fuel economy to consumers and that consumers rely on car manufacturers' advertising campaigns and gas mileage claims when making decisions in their vehicle purchases.

38.     By cheating in the certification testing, and providing a mileage cheat device in the vehicles, Ford made its F-150 trucks and other class vehicles more appealing and competitive

---

[25] https://www.freep.com/story/money/cars/2018/12/11/ford-ranger-fuel-economy-midsize-trucks/2267134002/ (last accessed October 7, 2019).
[26] *Id.*
[27] *Id.*
[28] https://www.ford.com/trucks/ranger/features/?searchid=1686695161|68389309809|402087311489|&ef_id=CjwKC Ajw3azoBRAXEiwA-_64Oj8QnJCk1LlnS37RY-sps-eRj9IRnpfhumx1PWuRyfFojqJUeVN9oBoCv88QAvD_BwE:G:s&s_kwcid=AL!2519!3!336803889107!e!!g!!2019 %20ford%20ranger%20fuel%20economy (last accessed October 7, 2019).
[29] https://www.ford.com/trucks/ranger/ (last accessed October 7, 2019).

in the marketplace, to the point of being named "best in class" for some class vehicles and driving up sales and profits.

### D. Ford admitted errors in its fuel efficiency testing procedures

39.     In September of 2018, several Ford employees expressed concerns about the testing practices at Ford pertaining to emissions and fuel efficiency. On February 21, 2019, the same day of the filing of Ford's Form 10-K for its fiscal year ending December 31, 2018, Ford finally admitted that employees had raised concerns, issuing a press release stating that "[i]n September, a handful of employees raised a concern through our Speak Up employee reporting channel regarding the analytical modeling that is part of our U.S. fuel economy and emissions compliance process."[30]   The release further stated that Ford had hired an outside firm to investigate the vehicle road-load specifications used in Ford's testing of emission and fuel economy and that they would be "evaluating potential changes to our road-load modeling process, including engineering, technical and governance components."[31]

40.     In particular, Ford indicated that it was going to assess the 2019 Ranger which was potentially affected and that the company was also "assessing additional vehicles as well."[32] The relevant time period affecting Class Vehicles goes back to 2017 at the very least.[33]

41.     Ford also included a disclosure about the miscalculations involved in its emissions certification process in the Company's Form 10-K filed February 21, 2019:

> Emissions Certification. The Company has become aware of a potential concern involving its U.S. emissions certification process. The potential concern does not involve the use of defeat devices in our products. On February 18, 2019, we voluntarily disclosed this matter to the Environmental Protection Agency, and we will fully cooperate with any inquiries. Because this matter is preliminary, we

---

[30] https://media.ford.com/content/fordmedia/fna/us/en/news/2019/02/21/ford-investigating-process-for-us-emissions-certification-conc.html (last accessed October 5, 2019).
[31] *Id.*
[32] *Id.*
[33] https://www.freep.com/story/money/cars/2019/02/21/ford-stock-drops-amid-news-gas-mileage-inquiry/2944609002/ (last accessed October 7, 2019).

cannot predict the outcome, and cannot provide assurance that it will not have a material adverse effect on us.

42.     At this time, Ford indicated that it had shared its concerns with both the EPA and the California Air Resources Board ("CARB"); however, as of February 21, 2019 (the date of Ford's announcement), a CARB spokesperson revealed that "CARB has not received notification of the mileage issue from Ford."[34]  In fact, Steve Cliff, deputy executive officer of CARB, told the Detroit Free Press that CARB had "learned of the apparent concerns with Ford's emissions certification through reports in the press."[35]

43.     In response to Ford's announcement, the EPA issued a press release stating that the information from Ford's investigation is "too incomplete for EPA to reach any conclusions. [The EPA] take[s] the potential issues seriously and [is] following up with the company to fully understand the circumstances behind this disclosure."[36]

44.     Ford Motor Company's April 26, 2019 Securities and Exchange Commission 10-Q filing revealed that it is under criminal investigation by the United States Department of Justice for its emissions certification practices.[37]

45.     Ford has a history of problems relating to errors in its fuel economy claims.  For instance, in 2013, Ford overstated the fuel economy for "its C-Max hybrid model by seven miles per gallon and in 2014 lowered fuel economy ratings for six other models and offered compensation to customers."[38]  At the time, Ford's chief executive Alan R. Mulally vowed to

---

[34] https://www.freep.com/story/money/cars/2019/02/21/ford-stock-drops-amid-news-gas-mileage-inquiry/2944609002/ (last accessed October 7, 2019).
[35] *Id.*
[36] https://ca.reuters.com/article/businessNews/idCAKCN1QA2U0-OCABS (last accessed October 7, 2019).
[37] http://d18rn0p25nwr6d.cloudfront.net/CIK-0000037996/b2780ecb-0fed-4348-b017-19f1079d5f0e.pdf (last accessed October 5, 2019).
[38] https://www.reuters.com/article/us-autos-ford-emissions/u-s-opens-criminal-probe-into-ford-emissions-certification-idUSKCN1S21BD (last accessed October 7, 2019).

"tak[e] steps to improve our processes and prevent issues like this from happening again."[39] Thus, Ford knew or reasonably should have known that its testing methodology might yield inaccurate fuel economy ratings. Despite its internal awareness about the insufficiencies in its fuel economy testing methodologies, Ford again disseminated faulty fuel economy ratings to consumers about its vehicles, demonstrating an intentional or reckless disregard for the accuracy of its testing procedures.

### E.   Ford continued to mislead customers even after it had knowledge of employees' concerns about the fuel economy ratings of its vehicles

46.     Even after Ford employees raised concerns in September 2018 about the accuracy of its fuel economy claims, Ford's media center continued to tout the supposedly amazing performance of the affected vehicles, with claims of fuel efficiency front and center. On December 11, 2018, the Ford Media Center published a press release  about the 2019 Ford Ranger, titled, "*Adventure Further: All-New Ford Ranger Rated Most Fuel-Efficient Gas-Powered Midsize Pickup In America*."[40]  In it, Ford describes the 2019 Ranger as "the most fuel-efficient gas-powered midsize pickup in America – providing a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition. The all-new Ranger has earned EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined for 4x2 trucks."[41]

47.     The 2019 Ford Ranger vehicle brochure also repeated the claims about superior fuel efficiency of the vehicle, calling it "best-in-class" and "unsurpassed."[42]

---

[39] https://www.nytimes.com/2014/06/13/business/ford-lowers-fuel-economy-ratings-on-some-of-its-cars.html (last accessed October 7, 2019).
[40] https://media.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html (last accessed October 7, 2019).
[41] *Id.*
[42] https://www.ford.com/services/assets/Brochure?make=Ford&model=Ranger&year=2019 (last accessed October 7, 2019).

48.     Ford also has repeatedly promoted the F-150 as "best-in-class" for fuel economy.  For decades, the Ford F-150 truck has been the best-selling vehicle in the United States.[43]  For its 2018 model, Ford issued a press release on August 9, 2017 promising that the "most advanced F-150 powertrain lineup ever enables best-in-class payload, towing and gas mileage."[44]  Ford called the 2018 F-150 model "even more fuel-efficient" and promised that "its second-generation 2.7-liter EcoBoost has an EPA estimated rating of 20 mpg city, 26 mpg highway and 22 mpg combined which is best-in-class."[45]

49.     Real world driving of the 2019 Ford Ranger has demonstrated that the Company's claims of superior fuel efficiency are not true.  After Ford released its February 21, 2019 statement admitting the faulty calculations used in laboratory testing of its vehicles, truck blogger Andre Smirnov of TheFastLaneTruck.com drove the 2019 fully-loaded Ranger 4 x 4 for 1,000 miles from California to Colorado to test its real-world mileage.[46]  As a result of this experiment, Smirnov found that the 2019 Ranger achieved only 19.5 MPG, and not the 24 MPG certified to the EPA for that vehicle.[47]

50.     Noting that the uphill drive from the ocean to the mountains might have skewed results, Smirnov again put the 2019 Ranger to the test on a 98-mile fuel economy loop, nearly all of which was on the highway, in order to see if the results would come anywhere close to the MPG estimate touted by Ford.[48]  This time, he found that "the Ranger's trip computer told us that the truck managed just over 25 mpg, though our math at the fuel pump did not add up to the

---

[43] https://www.businessinsider.com/ford-f-series-f150-truck-sales-record-history-2017-1 (last accessed October 7, 2019).

[44] https://media.ford.com/content/fordmedia/fna/us/en/news/2017/08/09/new-ford-f150-most-advanced-powertrain-lineup-ever.html (last accessed October 7, 2019).

[45] *Id.*

[46] https://www.tfltruck.com/2019/02/real-world-2019-ford-ranger-fuel-economy-here-is-the-unexpected-result-after-a-1000-mile-road-trip-video/ (last accessed October 7, 2019).

[47] *Id.*

[48] https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/ (last accessed October29, 2019).

same number."[49]  Instead, the test driver discovered a nearly four MPG discrepancy between the mileage reported on the Ranger's trip meter and what they measured at the pump: 21.3 MPG as measured by the test drivers, versus 25.8 MPG as reported on the vehicle's trip meter.[50]

51.     This discrepancy between real-world results and the MPG reported on the 2019 Ford Ranger's trip meter raises the question of whether Ford has programmed its onboard computer with a mileage cheat device in order to conceal the true fuel efficiency of its vehicles.

52.     Ford has engaged in willful conduct intending that consumers rely on its advertised MPG estimates while knowing they are not an accurate reflection of the actual MPG ratings achieved by the vehicles.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3) individually and as a class action on behalf of the following proposed National Class and State Subclasses:

> **National Class: All persons in the United States who purchased or leased a Class Vehicle in the United States (the "Nationwide Class").**
>
> **Michigan Subclass: All persons who purchased or leased a Class Vehicle in the State of Michigan (the "Michigan Subclass").**

54.     Excluded from the Classes are Defendant, its parents, subsidiaries and affiliates, directors and officers, and members of their immediate families, and the Judge(s) assigned to this case.  Plaintiff reserves the right to modify the Nationwide Class and the Subclass definitions if discovery and/or further investigation reveals that they should be modified.

55.     Plaintiff reserves the right to establish subclasses where appropriate.

---

[49] *Id.*

[50] Video imbedded within https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/ (last accessed October 29, 2019).

56.     **Numerosity**: The Class and Subclasses are so numerous that joinder of all their members is impracticable.  Although the precise number of such persons is unknown, and the facts are presently within the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes hundreds of thousands of Class Vehicles have been sold and leased throughout the United States as well as by members of the Subclasses.

57.     **Commonality and Predominance**: There are questions of law or fact common to the Classes that predominate over any questions affecting individual members. Those questions include but are not limited to the following:

   a.   whether Ford engaged in conduct alleged herein;

   b.   whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

   c.   whether Ford designed, manufactured, marketed, distributed, leased, sold or otherwise placed Class Vehicles into the stream of commerce in the United States when it knew, or should have known, that the fuel-economy ratings of the Class Vehicles were false;

   d.   whether Ford knowingly failed to disclose that the fuel-economy ratings of the Class Vehicles were false;

   e.   whether Ford  violated Michigan's Consumer Protection Act;

   f.   whether Plaintiff and members of the Classes have suffered ascertainable loss of money or property value as a result of Defendant's omissions and/or misrepresentations of material facts related to the Class Vehicles' fuel economy;

   g.   whether Plaintiff and members of the Classes are entitled to monetary damages and/or other remedies, and if so the nature of any such relief;

   h.   whether Ford was unjustly enriched at the expense of the Classes and Subclasses; and

   i.   whether Plaintiff and the other members of the Classes and Subclasses are entitled to equitable relief or other injunctive relief and, if so, in what form.

58.     **Typicality**: Plaintiff's claims are typical of the claims of the Classes since Plaintiff leased or purchased a Class Vehicle with a false fuel economy rating, as did each

member of the Classes.  Furthermore, Plaintiff and all members of the Classes sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendant's wrongful conduct.  Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent Class members.

59.     **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Classes and have retained counsel experienced in pursuing complex class action litigation and they intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

60.     **Superiority**: Class action treatment is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Classes.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Classes to effectively redress the wrongs committed against them on individual bases.  Even if the members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Classes can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims and registration records.

61.     Defendant has acted, and refused to act, on grounds generally applicable to the Classes, thereby making final equitable relief appropriate with respect to the Classes as a whole.

62.     Without a class action, Defendant will likely retain the benefit of its wrongdoing and will continue a course of action which will result in further damages to Plaintiff and the members of the Classes.

## TOLLING OF STATUTES OF LIMITATION

63.     Any applicable statutes of limitations have been tolled by Ford's knowing and active concealment, denial, and misleading actions, as alleged herein. Plaintiff and members of the Classes defined above were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part. Plaintiff and members of the Classes could not have reasonably discovered that the fuel economy ratings were not accurate until Ford had disclosed this information which was publicly released shortly before this class action litigation was commenced.

64.     Ford is under a continuous duty to disclose to Plaintiff and members of the Classes the true character, quality and nature of the Class Vehicles, and to disclose the truth regarding the fuel economy ratings.  Ford knowingly, affirmatively and actively concealed the true fuel economy ratings of the Class Vehicles. Plaintiff and members of the Classes reasonably relied upon Ford's knowing, affirmative and active concealment. Based on the foregoing, Ford should be estopped from relying on any statutes of limitation as a defense in this action.

65.     Plaintiff and members of the Classes could not have known that the Class Vehicles were marketed, sold and leased with false fuel economy ratings, as a result of Ford's fraudulent concealment of the true MPG and EPA fuel economy ratings of the Class Vehicles. Plaintiff and members of the Classes did not discover, and could not have discovered,

through the exercise of reasonable diligence, the true nature of the fuel economy of the Class Vehicles.

## VIOLATIONS ALLEGED

### COUNT I
### VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT
**(On Behalf of the Nationwide Class Pursuant to 15 U.S.C. §2310(d)(1)(A))**

66.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

67.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a) and (d).

68.     Plaintiff brings this Count individually and on behalf of all Class Members.

69.     Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson Moss Warranty Act, 15 U.S.C. § (4)-(5).

70.     The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

71.     Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

72.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

73.     As described above, Defendant expressly warranted in advertisements that the Class Vehicles would attain a certain fuel economy efficiency. These written warranties fall within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

74.     Under 15 U.S.C. § 2301(7), Defendant created implied warranties for the Class Vehicles.

75.     With respect to Class members' purchases or leases of the Class Vehicles, the terms of Ford's express and implied warranties became part of the basis of the bargains between the parties.

76.     Ford breached these warranties as described in more detail above.  Without limitation, the Class Vehicles experience less MPG than represented by Ford.

77.     Plaintiff and members of the Classes are in privity with Defendant in that Defendant is the warrantor of its representations to Plaintiff and the Class.

78.     It is unnecessary and futile to afford Ford a reasonable opportunity to cure their breach of written warranties.  Ford knew or should have known of the misrepresentations concerning the Class Vehicles' fuel economy ratings at the time of sale or lease of each Class Vehicle, and failed to rectify those misrepresentations. Consequently, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiff or Class members resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

79.     As a direct and proximate result of Ford's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiff and the members of the proposed Classes have sustained damages in an amount to be determined at trial.

80.     All jurisdictional prerequisites have been satisfied.

81.     Plaintiff, individually and on behalf of the Nationwide Class, seeks all damages permitted by law, including diminution in the value of their vehicles, in an amount to be proven at trial.

**COUNT II**
**MICHIGAN CONSUMER PROTECTION ACT,**
**MICHIGAN COMPILED LAWS ANNOTATED § § 445.901, *et seq.***
**(On Behalf of the Michigan Subclass)**

82.     Plaintiff Jeffrey Kaloustian ("Plaintiff" for purposes of this Count only) hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.  Plaintiff Kaloustian asserts this cause of action on behalf of himself and the Michigan Subclass.

83.     Defendant's business acts and practices alleged herein constitute unfair, unconscionable, and deceptive methods, acts, and practices under the Michigan Compiled Laws Annotated §§ 445.901, et seq. (the "Michigan Consumer Protection Act").

84.     The Michigan Consumer Protection Act declares "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce" to be unlawful, Mich. Comp. Laws Ann. § 445.903(1), including "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; [a]dvertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented"; and "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."  Mich. Comp. Laws Ann. § § 445.903(1)(b), 445.903(1)(e), 445.903(1)(g), 445.903(1)(s).

85.     At all relevant times, Plaintiff and the Michigan Subclass were "consumers" within the meaning of the Michigan Consumer Protection Act.

86.     The Michigan Consumer Protection Act defines "trade or commerce", in part, to mean the "conduct of a business providing goods or services primarily for personal, family or

household purposes." Defendant's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the Michigan Consumer Protection Act.

87.     The practices of Defendant, described above, violate the Michigan Consumer Protection Act for, *inter alia*, one or more of the following reasons:

    a)  Defendant provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements to consumers regarding the fuel economy of the Class Vehicles;

    b)  Defendant engaged in unconscionable commercial practices in failing to reveal material facts and information about the inaccuracies of the fuel economy ratings for Class Vehicles, which did, or tended to, mislead Plaintiff and the Michigan Subclass about facts that could not otherwise reasonably be known by the consumer;

    c)  Defendant failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

    d)  Defendant failed to reveal material facts to Plaintiff and the Michigan Subclass with the intent that Plaintiff and the Michigan Subclass rely upon the omission; and

    e)  Defendant made material representations and statements of fact to Plaintiff and the Michigan Subclass that resulted in Plaintiff and the Michigan Subclass reasonably believing that the represented fuel economy ratings of the Class Vehicles were of a standard other than what they actually were.

88.     Defendant intended that Plaintiff and the Michigan Subclass rely on their misrepresentations and omissions.

89.     Defendant's actions impact the public interest because Plaintiff and the Michigan Subclass were, and continue to be, injured in the same way as thousands of others as a result of and pursuant to Defendant's generalized course of deception as described throughout the Complaint.

90.     As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff and the Michigan Subclass suffered, and continue to suffer, an ascertainable loss of money or property, real or personal, as described above

91.     The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that these consumers could not have reasonably avoided; this substantial injury outweighed any benefits to consumers or to competition.

92.     Defendant knew or should have known that it had not been accurately testing the fuel economy of the Class Vehicles.  Defendant's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Michigan Subclass.

93.     Defendant knew or should have known that it had not been accurately testing the fuel economy of the Class Vehicles. Defendant's actions in engaging in the unfair practices and deceptive acts described above were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of Plaintiff and the Michigan Subclass.

## COUNT III
## BREACH OF EXPRESS WARRANTY
**(On Behalf of the Nationwide Class or, Alternatively, the Michigan Subclass)**

94.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

95.     Defendant at all times was a merchant with respect to Class Vehicles.

96.     In selling Class Vehicles, Defendant expressly warranted in advertisements, including in the stickers affixed to the windows of their vehicles, that their vehicles experienced a favorable fuel economy of specific MPGs, depending on the vehicle.

97.     These affirmations and promises were part of the basis of the bargain between the parties.

98.     Defendant breached these express warranties arising from their advertisements, including window stickers, because the fuel economy ratings for Class Vehicles are inaccurate.

99.      As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Classes have been damaged in an amount to be determined at trial.

**COUNT IV**
**COMMON LAW FRAUD**
**(On Behalf of the Nationwide Class or, Alternatively, the Michigan Subclass)**

100.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.  Defendant made material misrepresentations and omissions concerning a presently existing or past fact.  For example, Defendant did not fully and truthfully disclose to its customers accurate fuel economy ratings of the Class Vehicles.  As a result, Plaintiff and the Class members were fraudulently induced to lease and/or purchase Class Vehicles based on false fuel economy ratings.

101.    These omissions and statements were made by Defendant with knowledge of their falsity, and with the intent that Plaintiff and Class members rely on them.

102.    Defendant affirmatively misrepresented and concealed material facts concerning the fuel economy of the Class Vehicles.

103.    Defendant had a duty to disclose the true fuel economy based on their superior knowledge and affirmative misrepresentations to the contrary.

104.    Defendant affirmatively misrepresented and/or actively concealed material facts, in whole or in part, intending to induce Plaintiff and members of the Classes to purchase their vehicles and/or purchase their vehicles at a higher price than they otherwise would have.

105.    Plaintiff and the members of the Classes were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

106.    Ford made the omissions and concealment of material facts discussed above with knowledge of the effect of concealing these material facts.  Ford knew that by misleading consumers, Ford would sell or lease more Class Vehicles.

107.    Plaintiff and Class members justifiably relied upon Ford's knowing, affirmative and active concealment. By concealing material information about the Class Vehicles' fuel economy ratings, Ford intended to induce Plaintiff and putative class members into purchasing or leasing the Class Vehicles.

108.    As a direct and proximate result of Ford's omissions and active concealment of material facts, Plaintiff and Class members have been damaged in an amount to be proven at trial.

**COUNT V**
**UNJUST ENRICHMENT**
**(On Behalf of the Nationwide Class or, Alternatively, the Michigan Subclass)**

109.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.  Defendant distributed the Class Vehicles into the stream of commerce with the knowledge that these vehicles would be

purchased or leased by consumers based on a reasonable expectation that its representations relating to fuel economy ratings were accurate.

110.    Defendant distributed the Class Vehicles with the knowledge that the fuel economy ratings were false which made the Class Vehicles worth less than the price being paid for them.

111.    Because of its wrongful acts and omissions, Defendant charged a higher price for Class Vehicles than the vehicles' true value and Defendant obtained monies which rightfully belongs to Plaintiff and putative class members.

112.    Defendant received an economic benefit at the expense of the consumers of the Class Vehicles.

113.    In the circumstances, principles of equity and good conscience make it unjust for Defendant to retain the benefit conferred on it by consumers of the Class Vehicles and Defendant should be required to pay for this benefit.

**COUNT VI**
**BREACH OF CONTRACT**
**(On Behalf of the Nationwide Class or, Alternatively, the Michigan Subclass)**

114.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth fully herein.

115.    Defendant has expressly and unambiguously sold the Class Vehicles claiming false and inflated fuel economy ratings as more fully set forth herein.  Plaintiff and the Class Members purchased the Class Vehicles which constitute valid contracts with the Defendant.

116.    The fuel economy ratings of the Class Vehicles as claimed in Defendant's marketing and advertising, constitute terms or representations which form the basis of the contract for the Plaintiff and the other Class Members with the Defendant.

117.     The Defendant failed to perform as required by the contracts and breached the contracts by delivering the Class Vehicles with markedly less fuel economy than advertised.

118.     As a result of the foregoing, Plaintiff and the Class Members are entitled to compensatory damages, plus interest, costs and such additional relief as the Court may deem appropriate or to which Plaintiff and the Class may be entitled.

119.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

120.     Defendant made fuel economy representations to Plaintiff and members of the Class that were not true.

121.     Defendant had no reasonable ground for believing these representations were true when they made them, yet they intended that Plaintiff and Class Members rely upon these misrepresentations.

122.     Plaintiff reasonably relied on Defendants representations and as a result Class Members were harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class and Subclass members, respectfully requests that this Court grant the following relief:

A.     Allow this action to proceed as a class action under Rule 23 for all claims alleged, designate Plaintiff as the representative of the class and the undersigned counsel as counsel for the class;

B.     Enter judgment against Defendant in favor of Plaintiff and each member of the Classes, in the amount of actual and compensatory damages, and pre-and post-judgment interest as allowed by law and enjoin Defendant from future violations;

C.      Award all actual, general, special, incidental, statutory, treble, punitive, and consequential damages to which Plaintiff and members of the Classes are entitled;

D.      Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to notify all Class Members about the inaccurate fuel economy ratings of the Class Vehicles and provide correct fuel economy ratings;

E.      Award Plaintiff and the Class Members attorney's fees and costs incurred in this litigation; and

F.      Grant Plaintiff such further relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, by his counsel, hereby demands a trial by jury on all claims and issues so triable.

Dated:  October 30, 2019

By:  _/s/ Paul F. Novak_____

Paul F. Novak (P39524)
Diana Gjonaj (P74637)
Gregory Stamatopoulos (P74199)
Tiffany R. Ellis (P81456)
**WEITZ & LUXENBERG**
Fisher Building
3011 West Grand Blvd., Suite 2150
Detroit, Michigan 48202
Tel: 313-800-4170
pnovak@weitzlux.com
dgjonaj@weitzlux.com
gstamatopoulos@weitzlux.com
tellis@weitzlux.com

*Attorneys for Plaintiff and the Putative Class*